Case number 18-1677, Ammex Inc v. Gordon Wenk. All arguments not to exceed 15 minutes per side. Mr. Robert Poulombis for the appellant. Good morning. Good morning, your honors. May it please the court, Robert Poulombis on behalf of Ammex Inc. I'd request to reserve two minutes for rebuttal, please. Very well. Congress has the exclusive authority to regulate foreign commerce under the Foreign Commerce Clause. It has affirmatively exercised that authority by establishing a system of duty-free stores and determining what those stores can sell into foreign commerce. The state of Michigan now imposes controls through its environmental regulations on what Ammex, a duty-free store, can sell into foreign commerce. And under the Foreign Commerce Clause, the state lacks the authority to impose such a control. In addition, because Congress has imposed an extensive and pervasive scheme of regulation under both statute and regulation for duty-free stores, the environmental regulation that Michigan has imposed is preempted. Okay, why isn't the Michigan statute, which has been adopted by the EPA as part of the state implementation plan and included in the federal regulations, why is that not now federal law? Well, it is federally enforceable. That's clear that the federal government can now enforce it on its own right. It may be federal law in the sense that the adoption in the CFR creates a parallel federal regulation that the EPA can enforce. Another way to look at it, which we've suggested, is that it remains state law and the Clean Air Act simply gives the EPA the authority to enforce that state law. Well, the state of Michigan cannot change it without federal approval, right? That's right. So it is set in stone as federal law or federal regulation, I guess, unless the feds allow Michigan to change it, right? That's correct. That's part of the scheme of the federal Clean Air Act, is it not, that the states propose methods to comply with the federal Clean Air Act and the feds determine whether that is in compliance with the federal law and then they adopt the state regulation if it complies. I mean, that's the way it works, isn't it? That's all correct, Your Honor. Okay, so the fact that it starts from the state law, I mean, that's required by the federal statute, is it not? That's also, it could be. Well, how else would you have a regulation that complies with the federal Clean Air Act if it did not start with the state law like this did? The federal EPA can also create a federal implementation plan in the event that the state doesn't propose one. In the event they don't? Correct. Okay, but that's kind of the exception rather than the norm. But isn't this sort of a hybrid situation where they notify the state that the numbers aren't satisfactory and they have to do something about it and so the state responds by lowering the permissible level and one of the findings that the feds have to find is that it's necessary, otherwise you can't lower it below nine? That is all correct. Judge Griffin, what you've said is correct. Here's why it's still state law. Because, first of all, the Michigan legislature passed it, the governor signed it. Secondly, when MDARD seeks to enforce it, what MDARD is enforcing is state law. MDARD doesn't purport, for example, in the 2012 enforcement action, stop-sale action that MDARD brought against Amex enforcing these regulations, MDARD didn't purport to be enforcing federal law. In fact, just the opposite. It purports to enforce its own state law. Can it be both state and federal law? I think it can, Your Honor. If it's federal law, how does that violate the Commerce Clause, since the federal government obviously can regulate foreign commerce? It violates it to the extent that the state of Michigan, MDARD, is enforcing its own state law. Well, if it's both state and federal law, you say that state enforces its own law violates the foreign commerce? Well, they're also enforcing federal law. State prosecutors or state policemen can enforce federal law too, can't they? Can they not? Potentially, Your Honor, but in this case the state wouldn't, and the state regulations say that they wouldn't, and in fact the state hasn't when it has enforced these exact regulations. I take Your Honor's point that when it becomes federal law, and if the EPA were to enforce it, that would be a different situation for the Commerce Clause analysis. The action here is that where it's applied by the state to Amex, that that creates a dormant Commerce Clause problem and a preemption problem. You're not arguing they're applying it incorrectly or contrary to the federal interpretation of it or anything like that, are you? No, that's exactly what we're arguing, that as applied to exports, the EPA has stated in response to comments that its volatility regulations do not apply to exported goods. Are you arguing that in this case right now? We're arguing that to the extent that MDARD were to seek to apply its law and these volatility regulations to Amex, a duty-free store, which sells solely into foreign commerce and solely for export, that that would be in violation of both the federal regulations and statute-related duty-free stores? It doesn't sell solely in foreign commerce. It sells in the state of Michigan, and if I were to go to this gas station, I'm in the state of Michigan, and I can run my car at least in the area between the gas station and the Ambassador Bridge, and maybe I could circle around the parking lot and keep my car running for a while, and I would be using the gasoline in the state of Michigan, would I not? Well, Your Honor, you'd be using the gasoline in the exit, past the exit zone for the U.S. Customs jurisdiction. In the state of Michigan? It is in the state of Michigan, is it not? It is still in the state of Michigan. This gas station's not in a foreign country, is it? Well, but it's deemed to be selling in foreign commerce at that point. It is in the state of Michigan. The employees, I assume, are subject to the Michigan Workers' Compensation Act, probably the Michigan Fair Hours and Labor Acts. If there's a criminal act that occurs at this gas station, I assume the people will be prosecuted by the state of Michigan, right? Well, it depends on what it is, but to the extent that it's not, maybe it's fine. All right, it's within the jurisdiction of the state of Michigan. Well, except... Except for the taxes on the duty-free. And that is what this regulation goes to, and I'd like to just draw this distinction to make it clear. The state of Michigan requires vapor capture technology be used where the gasoline is taken from the truck to the storage facility. Amex complies with that regulation because it doesn't relate to what Amex can sell into foreign commerce. It relates to how it's delivered. Doesn't the vapor come out when they fuel the car in the state of Michigan, and those vapors would come out from that car into the atmosphere in Wayne County, Michigan, state of Michigan, and therefore the vapors don't only affect Canada, they affect Michigan, do they not? Yes, and, Your Honor, that's the same example because what we would say is Michigan has the authority to regulate the technology to capture the vapor during that process, during the pumping process. Michigan has specifically declined to regulate that. There was a proposal that was originally in the summer fuel laws to regulate what's called stage 2 vapor capture. Michigan MDAR decided that that was unnecessary because 95% to 98% of the vapor is captured by the current technology. The state of Michigan decided not to regulate the fuel pump process any further, but that goes to the point. Let me ask you a technical question. So the vapors, do they come out while the car is driving, or is it only when the fuel is going into the car? So there are three points at which it could potentially come out in this system. One is during the transfer from the truck to the tank. That is governed by stage 1 technology which Amex complies with and which doesn't go to the sale. The second is the pump process, which MDAR has declined to regulate because it said that it's unnecessary to regulate. And then the third part is the combustion process which takes place from the tank to the bridge. What the evidence shows in this case, however, is that on average the cars that leave Amex are not combusting the gas that they take from the Amex pump, that they come in with enough gas in their tank and their lines that they don't begin combusting the gas until they cross into Canada. That's not been disputed by any evidence in this case. If it actually had come in empty, they would be using the gas. And I've come in empty to a gas station before. I mean, it's possible. It's not what you want to do, but... It is possible, Your Honor. The study, to be clear, is on average, but it's undisputed that for the most part, on average, there is no gas from Amex that's being combusted in the state of Michigan. Counsel, I'd like to get back to the question that was asked and that I'm trying to follow up with. Are you saying that you litigated below and are litigating now and therefore will have received a decision on the question whether this regulation, assuming it's constitutional, is intended to be applicable to your situation? Well, that is what we're regulating, and we're regulating it as a constitutional matter. That is what we're litigating and litigating as a constitutional matter. So maybe I'm not understanding, Your Honor. I'm going to ask it again. Are you saying that you did litigate below and are litigating right now the question whether if this regulation, assuming the regulation is constitutional, that you then accept that it was intended to apply to your situation? I rephrased it wrong. Are you saying that one of the issues before us and an issue that you presented to the trial court is the question whether this regulation is intended to apply to this situation? Yes, Your Honor. That's what we've litigated. Okay. I thought that you were litigating the constitutionality of it. So the two questions, the two answers are linked. We are litigating the constitutionality of it because our position is that this regulation shouldn't and can't constitutionally apply to Amex in particular, not that it can't apply to other gas stations. Okay. I'm sorry. Let me make myself clear. You have this regulation. Right. Okay. One question is, assuming it applies to you, is it constitutional? Right. And that's what I thought was before us. It seems to me to be a different question whether you say, okay, it's constitutional, but it was never intended when it was passed and when it was approved, it was never intended to apply to this situation. That seems to me to be a different question. So hopefully I can clear this up. Michigan clearly, MDARD clearly intends to apply the regulation to this situation. We are not arguing that on its terms that the regulation does not apply to Amex as a gasoline dispenser. The entirety of our argument is that it cannot constitutionally do so. So that is the entirety of your argument? Correct. Okay. But it's an as-applied challenge, even on the constitutional level. Okay. But the answer to the question whether a regulation was intended, either by the federal government or the state government, to apply to a particular situation, I don't think is necessarily answered by the fact that the regulators are attempting to apply it in that particular situation. You can have a regulation that wasn't intended to apply to a particular situation. They're trying to apply it, and you come to court and say, look, this is not an intended application of this general provision. But you're not arguing that. Under the terms of the Michigan fuel laws, it would apply to Amex if it were constitutional. We've argued it's not. Okay. Thank you. Counsel, you're out of time, but I'm interested as to moving on to the other issues. I mean, at this point I'm rather inclined to rule that this is federal law, and therefore we don't even have a Commerce Clause issue. But assuming I'm wrong or assuming my colleagues disagree with me, and I have not talked to them about it, can you move on? And assuming this is not federal law, this is state law, how does this violate the Commerce Clause, just briefly? Certainly, Your Honor. The core here is that because Congress has established a national policy with respect to duty-free stores, which exist solely for foreign commerce, and that policy includes a policy of broadly allowing the sale of any goods through duty-free stores with the exception of explosives, other than fireworks, and perishables, that Michigan's attempt to control the goods that Amex can sell, and specifically the type of gasoline it can sell, into a foreign market is unconstitutional. It steps on the federal powers, which are exclusive. Even though the EPA consents to it? It steps on federal powers, although the feds are just very happy with it. But again, Your Honor, the only indication we have from the EPA, all in the record, is that the EPA has said the volatility regulations that are of the kind at issue here do not apply to exports. And so the EPA, to the extent it's even thought about this, has sided with our position, because these goods only go for export into foreign commerce. But other than that, the EPA hasn't given any indication one way or another as to whether... Gas only goes to export in foreign commerce. Correct, Your Honor. Okay, well, I think I've stopped at this gas station on my way to Canada for dinner when I'm working in Detroit, fill up the gas station, go over to Windsor, have a nice dinner at the Italian restaurant in the Italian town, and then come back. And I might have used a little bit of your gas, but not much, but I brought it back to the United States. So how can you say it's all used in a foreign country? I haven't used it all there. Because when a customer comes back to the United States with gas in the tank, what the customer should do is declare it. Declare it, okay. And pay tax on it. I'm sorry to inform Your Honor of that. I'm in trouble now. I hope the statute of limitations is run. And there is no, other than the testimony Your Honor has just given, there's no evidence that that occurs. It occurs all the time. People go to Windsor and come back. They go to shop. But if that were the case, U.S. Customs would have an obligation to find that, to ferret it out. There's no evidence that that has occurred. There's no evidence in this record that that occurs. And one way in which it... We're supposed to assume people go across the Ambassador Bridge and they just keep going. They never come back. I mean, the bridge has got commerce going back and forth. It's harder now to go back and forth. But, you know, when I used to be on the Court of Appeals in Detroit, I mean, it was very easy to go over to Canada and come back. And we did it all the time. I mean, it was just, you didn't think anything about it. What I can say, Your Honor, is that the entire scheme of the duty-free store is that the gasoline and the other goods are put into foreign commerce for export and don't come back. And to the extent that they do come back, the U.S. Customs has an obligation, would actually have to regulate Amex's sale of gasoline. It's never done that because there's no evidence that it comes back. Could they? Well, I mean, gasoline's a little different commodity than other things you would ship overseas and you would think that you have to declare when you come back. I don't think anybody thinks you've got to declare the gas in your gas tank when you come back. But that's what you say you've got to do. It's a duty-free good. That's what is required under law. And the testimony in this case is that it would have to. One quick question. What is the site for the EPA regulation or statement or whatever that you say would exclude duty-free goods? 54 Federal Register 11868. Thank you. 118 what? 6-8. Judge White, do you have a question? I have one question. Could you sell gas that had less pressure than 9? Could you sell gas at 12? Amex could sell any gas that would be legal and accepted in Canada because it's selling solely into the foreign market. Just to give a different example, Amex can sell alcohol to a 19-year-old because that's legal in Canada. Amex cannot sell cigarettes to a 19-year-old, even though that would be legal in Michigan, but it's illegal in Canada. So the same rule applies to the gasoline. It needs to comply with whatever the Canadian rules are, which I believe are 10 PSA. So what does Canada require? Ten, I believe is the answer, depending on the season, but that's my understanding. Okay. And 10 would not be in compliant with federal law, right? Correct. But you're saying you can sell it at 10? Yes, Your Honor. Okay. Are you basing that on your view of the law or is there some place where we can verify that you're allowed to sell it at 10? Well, no, it's consistent with our arguments in this case. I can't point you to a citation that says that, other than the fact that the way the duty-free store works is that the goods must comply with the regulations in the foreign market. So the same would occur here. Now, the difference there, Your Honor, is that because that is a federal regulation, that it wouldn't be a Dormant Commerce Clause problem or a regulation problem. It would just be one of how do the two federal laws interact there. Our view would still be under those circumstances that, under statute, the duty-free store can sell anything other than the specifically- Well, it would certainly provide some context for us, if that were the case, that the feds don't even apply their own law. I mean, and if this is the same thing, it's just what they want to see in Michigan, and they don't apply a nine requirement for export in this particular situation, I think it would be very informative. Right. And what I can tell you, Your Honor, is what the record shows is that there has never been enforcement by EPA of the volatility regulations as applied to Amex. That just simply hasn't occurred. The only enforcement has been by the State of Michigan under its own laws and under this particular law that's at issue. So I don't have a citation to point you to, but in terms of the history of this, what you said is true. The federal government has not sought to enforce its own regulations on this duty-free environment. In our view, the Hofstadter case that we cited would not allow Michigan to do that. I think it's very clear that this is in the zone of foreign commerce where the power of Congress to determine and speak with one voice is at its height. Michigan, Your Honor, it's not about the pumping, it's not about the bringing from the tank to the storage. Those types of regulations don't affect what goods can be sold into foreign commerce. That is at the core of what Congress determined in the duty-free scheme. Hofstadter is a little distinguishable, is it not, that the alcohol was shipped directly to the foreign country and it was not delivered in the JFK Airport. Here, the gasoline is delivered in the State of Michigan and then it goes to the foreign country. But there, it was shipped directly, right? That's right, Your Honor. The customer wouldn't pick it up until getting off the plane. As I've already described, for the reasons I've already described, that does not, in our view, make a legal difference, and I think as a factual matter, there's evidence in the record that the gas isn't being used until... I'm going to ask you for another side. The principle, I think you're articulating, in a federal law for duty-free sales is that the product is consumed in the foreign country. Is that correct, that that's the underlying principle? That it's, yes, that it's used... It's being used or consumed in the foreign country, not in this country. Correct. What is the statutory basis for that principle, or is there a, I'm sure there's a reg, but what would you say the statutory basis for that principle is and what is the reg for that principle? I would point your honor to, in terms of the statutes, 19 U.S.C. 1555. That's the statute that sets up duty-free stores. 19 U.S.C. 1557A is the statute that specifically indicates what goods can be sold. The regulations, 19 C.F.R. 19.1, 19.35. I would also point your honor to 19.36. If your honor were to look at those provisions, you would get the gist of what we've argued here in terms of what the duty-free stores can sell, what the requirements are for them to sell in the foreign commerce. And again, all of this is done under the control of U.S. Customs and Border Protection. I would point out, your honor, that the gasoline is in joint custody with First Amex and then the customer up until the point at which it leaves the United States. So as a legal matter, this is all still being done within the control and the supervision of the federal government. Thank you. Okay. Thank you, your honor. You'll have your rebuttal. Good morning. Good morning. May it please the court. I'm Elizabeth Morisot with the Michigan Department of the Attorney General. With me on the case is Danielle Allison-Yocum. We represent Michigan Department of Agriculture and Rural Development Director Gary McDonald. He asked that this court uphold the lower court's ruling. This court, as has been demonstrated through some colloquy already, can uphold the lower court's ruling really in one of two ways. One, this court can decide not to engage with the Clean Air Act at all and simply find that the gasoline vapor pressure requirements as pure state law are not preempted. Alternately, this court could also decide to jump into the morass of the Clean Air Act and find that Michigan's gasoline vapor pressure requirements, because they were found to be necessary under Section 211 of the Clean Air Act and then incorporated into the SIP under 110 of the Clean Air Act, transformed into federal law and thus there is no preemption analysis at play. You think the first is easier than the second? You know, it really depends on the judge's level of comfort. But the one point I will make is regardless of which of those two choices you make, the Foreign Commerce Clause has no application in this litigation whatsoever. As the two Michiganders on the panel can attest to, Detroit is located in Michigan, which is also located in the United States. Can you keep your voice up? There's the fact that the Michigan law applies to conduct that occurs entirely within the state of Michigan. And no one disputes that Amex's customers drive to Canada after they purchase the gasoline in Michigan. But that doesn't make Amex an exporter. This court has already told Amex that they don't export gasoline. For whatever reason, Amex still thinks that it does export gasoline. When did we tell them that they don't export? There was a prior case where Amex was trying to pull back taxes that had been placed on gasoline from one of their suppliers and they sued the federal government under the export clause to say, well, hey, we export gasoline, so you need to give us that money back. And after quite a few cases down below, ultimately it was decided that Amex had no standing to bring that suit because the federal – well, first of all, because they don't export gasoline. So because they don't export gasoline, they have no standing to try to pull back taxes that were paid on gasoline that they purchased from their supplier. I mean, Amex doesn't export gasoline. If they exported gasoline, then Starbucks would export lattes every time you drive one across the border, and Tim Hortons would export Double Doubles every time a Canadian drives back. But those aren't items sold in – those items sold in this sort of duty-free zone? No, but the fact is – so Amex makes – the whole purpose of the duty-free laws are to benefit domestic commerce that's located within 25 miles of an international border. It's fundamentally about benefiting domestic commerce. The whole idea is if we can let these companies sell certain goods without state or federal taxes, we'll be more likely to have people spend money in America instead of in Canada or instead of in Mexico. And so the duty-free laws are really just about can you avoid paying taxes. They're not about can you avoid every single other state and federal law that would otherwise be applicable. As Judge Griffin noted, Amex is subject to Michigan state employment laws. If they call 911, it's Michigan police who come. It's not the Royal Canadian Mounted Police. And frankly, there's other ways to regulate the gasoline that aren't before this court that Amex would not contest. MDARD is able to regulate them. For example, if Amex had too much water in its underground storage tanks where they're selling the gasoline out of, there's too much water in the tanks. When you refuel, if you put the gas in your tank and there's too much water in it, your car will literally break down. In 2016, there were some issues where Amex was selling bad gas. There was too much water in it. People broke down on the bridge before they got into Canada. Now, MDARD has regulations related to how much water you can have in your gasoline before you sell it to a consumer in Michigan. Is he correct that the only requirement is that it comply with Canadian law? That's not a requirement at all, no. And so the issue, MDARD is not regulating the product. They're regulating refueling, which is the conduct that occurs in the United States. Appellant also seems to take the position that there is no type of restriction that could be put on anything that's sold in a duty-free store. Now, we know that's not true. If they're going to sell cigarettes duty-free, unquestionably they're allowed to sell cigarettes duty-free. But they may not sell cigarettes that are laced with fentanyl duty-free. Now, are we allowed to regulate those cigarettes laced with fentanyl? Of course we can, because that's not about whether they can sell cigarettes. That's about whether they can safely sell cigarettes. And the issue here is not whether Amex can sell gasoline. MDARD does not say that Amex cannot sell gasoline. All they say is that, like other gasoline retailers in Detroit, during the summer months they must sell a certain type of gasoline. Well, let's go back to Europe. Could they sell, in the winter months, gas that was rated 10, which apparently is the Canadian standard? Well, both the Canadian standard and the American standard or the Michigan, I mean, every state has different standards, and even in Michigan there's different standards for the different counties. But generally the vapor pressure standards change throughout the year to accommodate two big issues. One is that as it's colder outside, you have more issues combusting the gas if it's at a lower pressure. So that's why you have a higher pressure in the requirements for the winter. And then in the summer you want to have a lower vapor pressure, because summer is when ozone is typically more likely to be formed. So, okay, I thought that nine was sort of the limit. Is that not right? The federal limit is nine in terms of that's what they say. You can't be more stringent than nine unless the EPA says that it's necessary in your situation. And so the times when it would be necessary to have a more stringent standard would typically be during the summer months. Previously Cincinnati actually had a lower RVP than nine, and actually just a couple of days ago it was lifted because Cincinnati has come into attainment with the ozone standard. So Cincinnati no longer has that lower RVP. But I think just to take a step back, this case is really much more simple than it seems. There's so many fascinating mouse holes and mole holes and rabbit holes. Any kind of hole you want, it's here. And wherever you want to go off down a tangent, you can. But the court doesn't have to. This is a very simple case about a state that is exercising its traditional police power to safeguard its citizens by regulating air pollution. I'd just like to deal with this export. Aren't these duty-free stores sort of deemed export stores, right? Like once you buy it, you have to leave. And there's no duty because it's been in this limbo area and it hasn't been imported, right? Absolutely. But that doesn't change the fact that when Amex pulls a truck up to the gasoline station and puts gas into its underground storage tanks, the vapor pressure requirements apply at that time. And then when the customers put the gasoline in their tanks, it applies at that time as well. And just to clarify something. Where do the trucks come from? So Amex has a station in essentially storage tanks in Taylor, Michigan, and they get deliveries into those tanks. And those are really big tanks. And then they take gas from those tanks and they bring it to the gas station in Detroit. So the gasoline actually travels across non-duty-free zone to get to the duty-free store. Yes. The tank is in – I thought that they got it from Ohio, from a duty-free zone in Ohio. So the reason that – and there's testimony on the record that they've gotten gasoline from the free trade zone in Toledo and that they've also gotten gasoline at times from Canada. But the reason they have to get gasoline in a special way instead of just any refinery is because they need to buy gasoline that doesn't have taxes put on it. Typically, the supplier bakes taxes into the cost when they sell gasoline to a gas station. And taxes are – they're significant. Gasoline taxes, when you add state and federal taxes, it's about 50 cents a gallon. So Amex needs to make sure that its supplier is not essentially upping the price up by 50 cents per gallon. And the way they do that is to go through this legal fiction of sort of having good paperwork and having tanks labeled so that they can say this gasoline that we are purchasing from this refiner is going to be sold at our duty-free store without taxes. But that's part of the scheme, though. That's part of the federal scheme. Absolutely. And it's the customers who are exporting the gasoline. It's not Amex. And what is being regulated is not just the product. It's the process. So when the gasoline is put into the tanks, that's regulated, the underground storage tanks, and also when it goes into the customers' tanks. And so the fact that Amex is able to get a tax break under the duty-free laws, that doesn't translate into license to not comply with otherwise applicable state laws. And so the fact that the customers go to Canada, that doesn't mean that Michigan's gasoline vapor pressure requirements don't apply because it's upstream of that export. But what about the supposed statement that these regs pertaining, you know, that the regs don't apply for export? If these things are deemed to be, through this process, are deemed to be designated for export? So to fully provide context to the comment that EPA had made there, EPA, and this was in a preamble in one of their, I think, the 1989 gasoline volatility regs, and a refiner had submitted a comment that said, Hey, I export gasoline. Do I have to comply with these gasoline vapor pressure requirements? And it was in that response that you could- Wait, who asked this? A refiner. Okay. And EPA's response was, if you, refiner, are exporting gasoline, you do not have to comply with these vapor pressure requirements. But later on, they said that the standards are, quote, And so what Amex would like you to believe is that this response in a comment to one refiner means that they, as a duty-free seller of gasoline, also get to not comply with gasoline vapor pressure requirements. But to be clear, that preamble was not about Michigan's gasoline vapor pressure requirements. It was about federal requirements. And so they're just not on par with each other. It's really- And this case is replete with pulling one line out of one thing and then making it stand for something much more grand. This is a very simple case. Amex owns a gasoline refueling station in Detroit. All gasoline refueling stations in Detroit have to sell lower pressure gasoline during the summer for three months, period. That's what this case really boils down to. And Amex cannot bootstrap its duty-free status into a law-free status. They're not entitled to do so. I did want to clarify a couple of things. I know that Judge Griffin was concerned about potentially having violated some importation laws. There's an exception. Just a minor point. Is the gas station in the city of Detroit? I thought it was in Wayne County. It's in Detroit. It's in the city of Detroit. Yeah, on 4th Street. But to clarify- What's the exception? The question is, if I fill up, if I buy this duty-free product and I don't consume it in Canada, whatever it is, and then I come back into the U.S., do I have to pay taxes on it? And you can have a bottle of alcohol up to one liter that you can bring back with you, and that's okay. And you can have up to 800- Without having to declare it, you're saying? Without having to pay re-import taxes on it. Okay. How about gasoline? You can have up to $800 of sort of undisclosed duty-free- That depends upon how long you stay there. So the re-import taxation depends on what is the dollar amount, and then there's also further clarification to the size of the bottle of alcohol or the carton of cigarettes. But the whole point is the reason you don't have customs agents asking you on your way back, where did this gasoline come from, is because at the end of the day it doesn't matter. They can't get taxes on you from it. So I wanted to clarify that point. And, you know, there's also been a lot of discussion. I guess the question is really, why should Amex not have to follow this law? The purpose of the duty-free customs law is to benefit domestic commerce located near an international border. That's it. It doesn't mean that domestic commerce should not follow state law if it means that they might make a little less money. That's not how preemption analysis works. And so we would ask this court to uphold- You're saying that the only benefit you get as a duty-free shop is that you don't have to pay taxes. Fundamentally, the purpose of- Everything else is fair game. The state can do anything else to that store. Well, in ITEL containers, that was where the Supreme Court said that there is no field preemption and that there's room for state law to regulate other aspects of- Do you have any authority for a state doing other things besides taxes to- I mean, I guess we do. I mean, we have obviously examples. We have a labor statute supplying and whatnot. Yeah, and Amex pays its general business tax every year. One of the harms that they associate, that they sort of claim is going to happen if they have to follow a law. I guess they're going to say the distinction is this is a regulation of an actual product that's duty-free. So that's- Do you have any example of a regulation of a product that was duty-free? So there's- And I don't have the site in front of me. I apologize. You gave the fentanyl example for the cigarettes, but presumably you don't have a case for that. That's just a hypo. No, but there's a long list of regulations in the CFR that were discussed, I would say, at length in the transcript before the lower court, where there's all of these different regulations where it says it's not just Customs who is regulating these specific products. Here is how EPA also regulates a product. Here is how another federal agency, pharmaceutical, the FDA also regulates this, or even exporting fur, different things. There's lots of concurrent jurisdiction over different products that can come out of duty-free stores. And so it's not the case that Customs is the only one who says this is what can come in and out of these doors. And the other distinction with the Hosteller case, the JFK liquor case, was that the state of New York was totally prohibiting alcohol? That's one distinction. Rather than regulating. That's one distinction. But another distinction is that you have to use gasoline to buy it. It's much different from a closed-container purchase. And so it would be the same as if you wanted to buy alcohol, you would have to open it and take a sip. Well, in that case, we know that Amex could not sell to 19-year-olds because 19-year-olds can't be drinking it. But they can sell to 19-year-olds because they feel very confident that those 19-year-olds are not going to open the bottle up on their premises and start drinking before they get to Canada. And so there was another case that Amex had brought up in their reply. And I notice my time is up, so I'll just finish this thought unless there's other questions. But there was another case that they had cited in their reply, the 3M case out of the 11th Circuit. And in that case, there was a Florida state law that says we can regulate pharmaceuticals. And then there was a Federal Free Trade Zone Act, and there was a warehouse located in a free trade zone off the coast of Florida where companies were warehousing pharmaceuticals and then sending them to other countries. They were never, ever going to be sold in Florida. And in that case, the 11th Circuit said, and Florida had threatened to inspect some of those pharmaceuticals. And the upshot was that Florida state law about regulating pharmaceuticals was preempted by the Federal Free Trade Zone Act. And the reason that was the case was because those pharmaceuticals were in a box and were literally shipped from one place to another, and the sale itself did not even occur in Florida. It would not have been possible for a Florida consumer to have access to those pharmaceuticals in the state of Florida. And so it's completely different. Because gasoline, as Judge Griffin noted, is something that when you put it in your tank, you immediately begin to use it. But that's interesting because that argument sort of concedes that as a general principle, these things are exempt from state law, and you're sort of saying, but gas is different. Well, that was a different law entirely. That was about the Free Trade Zone Act, which was not about duty-free stores. That's about shipping from one port to another and things of that nature. Well, that's really more hostile. I mean, that Florida case is pretty much on point with the liquor being shipped directly to the foreign country and not being opened. I mean, I can see how that really would come down to that. Okay, any further questions on this? All right, we've got some rebuttal. Thank you. And Director McDonald would request that this court uphold the lower court's ruling, and in the event that this court wanted to have the three other factors of the preliminary injunction analyzed first, he would ask that this court remand it to the lower court to do so instead of doing it. Affirm the judgment of the lower court anyway. Yes. Okay, thank you. Thank you. A few quick points, Your Honors. First, I just want to clarify one thing in response to the colloquy that we had, Judge White, with regard to what the scope of our challenge was here. I don't want what I said to be taken as a concession that Amex views that MDARD is correctly applying EPA regulations or EPA's guidance on this because, as we mentioned, there is the EPA guidance that says the volatility regulations would not apply to goods for export. So we are not challenging in this case. That doesn't change that point, but I didn't want it to be taken as a concession going forward. And you're not challenging it. You don't intend to challenge it below either if we were to affirm? Well, up to this point, it has not been challenged in this case. That's all I wanted to be clear about. Counsel for MDARD said that this case, that the Foreign Commerce Clause has no application to this case. That is really an astonishing statement, given that the duty-free store, by statute, sells for export. That's 19 U.S.C. 1555B. That is the basis of what duty-free stores are for. It's entirely for export. And so I actually agree when Counsel for MDARD says this is a very simple case. It is a simple case. Congress has determined in its exclusive power to regulate exports and to regulate foreign commerce, that Amex and any other duty-free store can sell goods with very limited exceptions under statutes. That's a determination that Congress made in its exclusive policy authority to regulate foreign commerce. The State of Michigan has tried to contravene that by limiting. It's not a total prohibition as it was, as Judge Griffith, you noted, in Hossetter, but it's still a limitation on what Amex can sell. Amex can no longer sell the good that the customers going to Canada and that are going to use this in foreign commerce find attractive. Finally, Judge Griffith, I heard you express skepticism about whether this is federal law. I would just point this out. For this to be only federal law and not state law. Why can't it be both state and federal law? It can be, Your Honor. Do we have to pick one or the other? No, Your Honor. What is your position? Is it both, or are you saying it's only state? Our position is that it could be both, that it could be just state. What it can't be is solely federal law. So you don't have to pick as between those two. But in our view, it can't be solely federal law, because what that would mean is that the federal government, that Congress has done... Why does that make any difference for our analysis, whether it's solely federal law or both state and federal law? It seems to me as long as you have federal law... Well, if they're identical, if they're the same, isn't it redundant that it's also state law? No, Your Honor. No? Because what we're seeking to enjoin is MDARD's potential enforcement action. But could they not enforce federal law? Correct. They could not enforce federal law. Okay. They can only enforce their state law as they did in 2012. They enforced their state law, Michigan state law. That is the action that we're seeking to enjoin here. Okay. And they're prohibited from enforcing federal law? I mean, I don't think most state agencies are prohibited from... They don't normally do it, maybe, but... I mean, there's a prohibition of the state enforcing federal law? Well, they would have to have some mechanism, statutory or regulatory, to allow Michigan to do that, and there is none. The closest that they can point to is a citizen-suit provision in the Clean Air Act that allows a person to enforce the federal regulation adopting a SIP. The authorization has to come from Congress for the state to enforce federal law. Right. And we don't believe that it has occurred here. For reasons we've discussed in the brief, the citizen-suit provision would not apply in this circumstance. But the statutory scheme contemplates federal approval and Michigan enforcement. Correct. But that's part of the federal statute. Right. But to assume that the federal statute has stripped a state law passed by a sovereign state, just stripped it of its state law character by approving that and incorporating it by reference into the CFR, is just very surprising. It's not stripping it. Federal law is using the same terminology, the same wording as the state law, and making it federal law. So how can it violate Congress's authority, given that Congress, through its delegated agency, has adopted the very same language in federal law as exists in state law? How can state law in any way undermine congressional authority? Because, well, if this were federal law, we would have the issue about how you interpret the two federal laws together, the customs regime and the EPA and the Clean Air Act regime. We would still have an argument under those circumstances. It would just be a different argument. In this case, the EPA is not a party. The injunction that's being sought is an injunction against MDARD. MDARD can only enforce, and in the past has only enforced, its own state law. So that's the logic here. If in the future the EPA were to bring an action under the CFR, under the regulations, that we would have similar arguments, but they would be about statutory construction and how you accommodate these two policy objectives that appear in federal law, that's different from whether MDARD, in its sovereign authority, has any ability to regulate what a duty-free store sells, not how the gas is pumped, not how the gas is brought from a tank, from a truck into a storage tank. Those are regulated. And that's not a regulation that would be set up. But the state regulation exists because the Congress, through the agency, said they have to do the regulation. Right, but what Congress never said was you have to apply those regulations to a duty-free store. That's never been said. The duty-free store sells to customers for export solely and exclusively. And so the question is whether Michigan has the authority to regulate what is sold for export when Congress has already broadly allowed any goods to be sold for export by a duty-free store with two specific exceptions. So why shouldn't we ask for an amicus brief from the SETS? I don't think that's necessary to decide this action because the statute is clear, the EPA has spoken on this, but at the same point we wouldn't oppose that. EPA, according to MDARD, is generally aware of this regulation and aware of how MDARD seeks to enforce it, has not stepped in to support MDARD. So I think that... Nor has it said... Nor has it supported either side. I don't think it's necessary for this court to take that step to decide the case. We think the policy is clear, the federal interest and the Congress... I'm still confused, and I don't want to repeat myself, but I'm still confused why this question of interpretation is only appropriate against the EPA and not here. I don't follow it, but apparently you think that question is not appropriate here. It's appropriate here because, as I've tried to describe, the EPA, in our view, has spoken on the fact that the RVP regulations, that volatility regulations generally do not apply to goods for export. Amex sells goods for export. It's a straight shot to a determination in our view that the EPA wouldn't regulate this. Thank you. Any further questions? All right. Thank you. Thank you, counsel. Case will be submitted. May call the next case.